187 N.J. Super. 55 (1981)
453 A.2d 572
IN THE MATTER OF LAWRENCE JENNINGS, AN INCOMPETENT (PETITION OF FANNY JENNINGS TO BE APPOINTED GUARDIAN AD LITEM).
Superior Court of New Jersey, Chancery Division Morris County.
Decided October 9, 1981.
*56 Roy D. Curnow argued the cause for petitioner Fanny Jennings.
C. William Bowkley, Jr. argued the cause for Tammy Jennings in opposition to the petition.
STANTON, J.S.C.
The question in this action is whether the mother of an adult comatose mental incompetent should be appointed as his guardian ad litem for the purpose of suing his wife for divorce on the ground of adultery.
The incompetent, Lawrence Jennings, is a young man in his mid-20s. On August 21, 1976, while fully competent, he was lawfully married to Tammy Jennings. Thereafter, the young couple lived together as man and wife in Morris County until January 10, 1978, when Lawrence Jennings entered the Dover General Hospital for what was believed to be relatively routine surgery. While being prepared for surgery on January 13, 1978, Jennings experienced cardiac arrest. For critical minutes the flow of oxygen to his brain was severely reduced and he suffered massive and irreversible brain damage.
From January 13, 1978 until the present time, Lawrence Jennings has been comatose. He is presently a patient in a *57 nursing home. Although he is able to breathe without mechanical assistance, he is totally immobile and unconscious. In order to be certain of his precise condition, with the consent of counsel I made a visit to Jennings's bedside on September 29, 1981. From the documentary evidence presented to me, and from my own observations, I am convinced that Lawrence Jennings has no intellectual functioning and that he is totally lacking in emotional sensitivity or response to his surroundings and to events.
In previous court proceedings Jennings has been adjudged mentally incompetent, and his wife Tammy Jennings, with the consent of his mother, has been appointed as the guardian of his person and property.
On September 16, 1981 Fanny Jennings, the mother of Lawrence Jennings, filed a petition seeking to be appointed as his guardian ad litem for the purpose of bringing a divorce action against his wife. The mother alleges that the wife has been guilty of adultery. The adultery is alleged to have occurred after the tragic accident. There is no claim that the marriage between Lawrence and Tammy Jennings was initially invalid or that the wife committed any marital wrong before the incapacitating accident.
It is to be noted that I am not presently being asked to decide whether Tammy Jennings has committed adultery. I am being asked to approve the appointment of Fanny Jennings as guardian ad litem for her son so that she may then attempt to get a divorce for him by proving his wife's adultery. The question presented in this case has never been decided by a New Jersey appellate court. In Niland v. Niland, 96 N.J. Eq. 438 (Ch. 1924), Chancellor Walker, sitting as a trial judge, ruled, at least preliminarily, that the parents of an underage woman who went through a marriage ceremony did not have standing to seek an annulment of her marriage. In making his ruling the Chancellor stated that "The remedy of divorce (and equally of nullity) and the right to seek it belong exclusively to one or other of the *58 spouses." Id. at 440. There are approximately 22 other states in which this kind of question has been decided in officially reported court decisions. The overwhelming majority of those states have decided that the guardian of an incompetent person may not sue for divorce on his behalf.
The many courts which do not permit divorce actions by a guardian stress the personal nature of a claim for divorce. No marital failing works an automatic destruction of a marriage. Of critical significance is a person's reaction to and evaluation of the actions of his spouse. This reaction and this evaluation are intensely personal to each individual. Most courts have viewed the decision to seek a divorce as so strictly personal that they do not permit it to be made by anyone acting in a representative capacity. The few courts that have permitted suits by a guardian have relied upon statutory provisions or upon a desire not to leave an incompetent spouse open to unremedied misconduct against him by the other spouse. See Annotation, "Power of Incompetent Spouse's Guardian, Committee, or Next Friend to Sue for Granting or Vacation of Divorce or Annulment of Marriage, or to Make a Compromise or Settlement in Such Suit," 6 A.L.R.3d 681.
In the briefs filed with me, counsel have analyzed at some length the rulings of the New Jersey Supreme Court in the cases of In re Grady, 85 N.J. 235 (1981), and In re Quinlan, 70 N.J. 10 (1976). The Grady and Quinlan cases involved incompetent people, but the specific issues presented in them are very different from the present issue. The same is true of the other New Jersey cases mentioned by counsel. In Quinlan and other cases New Jersey courts have permitted guardians to make, or to participate in making, critical decisions on behalf of incompetents unable to make decisions for themselves. However, there are no New Jersey decisions which give clear and specific guidance to me in the present situation. Although they do not give specifically relevant guidance, the New Jersey cases do make it clear that the polestar for judicial thinking in this area *59 is to be the best interests of the incompetent. The Grady case is particularly strong on this point. See 85 N.J. at 262-267.
I reach the conclusion that neither Fanny Jennings nor anyone else should be permitted to sue for divorce on behalf of Lawrence Jennings. For one thing, I agree with the many courts which have held that a decision to seek a divorce is so intensely personal that it cannot be made for someone else. Lawrence Jennings alone has the right to make this decision. The unfortunate fact that he lacks, and will always lack, the capacity to make it does not justify delegating that decision to someone else. I know that in her petition Fanny Jennings has stated her firm belief that if her son were of sound mind and knew of his wife's activities, he would seek a divorce. I am sure that Fanny Jennings does believe that, but the reality is that there is no reliable way of knowing what Lawrence Jennings would decide to do.
More importantly, I will not permit anyone to file a divorce action on behalf of Lawrence Jennings because he has absolutely nothing whatever to gain through such an action. He is intellectually incapable of learning of any marital offense by his wife. He is emotionally unable to react to any such offense. He is not able to appreciate the companionship or lack of companionship of his wife. By court action in another case, his property has been placed in the hands of a bank and cannot be misappropriated by his wife or by anyone else. In terms of his needs and interests, it would be totally pointless to grant Lawrence Jennings a divorce.
There are no New Jersey statutes relevant to the question of Fanny Jennings' right to seek a divorce on behalf of her son. N.J.S.A. 2A:34-14 is not an affirmative legislative enactment. Furthermore, whatever impact it has is limited to cases involving a parent of a minor child.
I have examined portions of the court records in a medical malpractice case brought on behalf of Lawrence Jennings in the Law Division of the Superior Court. That case bears the docket *60 number L 21160-79MM. On May 21, 1980 a consent judgment was entered in that case. Under the terms of that judgment Tammy Jennings will receive a total of $150,000 in her own right. A total of $600,000 will be paid for the benefit of Lawrence Jennings. Jennings' funds are being held for his benefit by a bank.
The $600,000 and income earned by the investment of that sum are to be used for the care of Lawrence Jennings. When he dies the balance of the funds being held for his benefit will be part of his estate. Since he has never made a will and now permanently lacks the capacity to make one, Jennings' estate will pass to his heirs under the laws of intestate succession. If Jennings were to die survived by both his mother (his father has previously died) and a wife, the wife would get the first $50,000 of his estate and she and the mother would then divide the remainder of the estate equally. N.J.S.A. 3A:2A-34. If Lawrence Jennings does not have a wife when he dies, his entire estate will pass to his mother if she survives him. N.J.S.A. 3A:2A-35 b. If Lawrence Jennings does not have a wife when he dies, and if his mother dies before he does, his entire estate will go to his brothers and sisters. N.J.S.A. 3A:2A-35 c.
It is likely that Lawrence Jennings will leave a substantial estate when he dies. If Tammy Jennings is then his wife, she will get at least $50,000 plus half of that estate, and she may get the entire estate. If Tammy Jennings is not Lawrence Jennings' wife when he dies, his entire estate will go to his mother or to his brothers and sisters. Fanny Jennings and her children obviously have a large financial stake in whether Lawrence Jennings remains married to Tammy Jennings. Just as obviously, Tammy Jennings has a large financial stake in remaining married to Lawrence Jennings.
Under these circumstances, a divorce action on behalf of Lawrence Jennings against his wife would really be, in large part, a struggle between Lawrence Jennings' wife and his blood relatives for the eventual inheritance of his estate. That is not *61 what divorce actions are supposed to be, and, of course, such a struggle has nothing to do with the best interests of Lawrence Jennings.
It may be that a case can be made for the proposition that Tammy Jennings should not get the bulk of Lawrence Jennings' estate because of some general principles of justice and equity. I do not mean to minimize the considerable burden which Lawrence Jennings' blood relatives would have in attempting to persuade a court in a decedent's estate proceeding that the normal rules of intestate succession should not be followed where Tammy Jennings is concerned. But, if that battle is to be fought, it seems to me that it should be fought after Lawrence Jennings is dead, between the right parties, under nonfictitious labels, when we know who survived Lawrence Jennings and when we know the size of the estate. It is important to remember that there are many factual possibilities so far as the ultimate disposition of Lawrence Jennings' estate is concerned. He may live for a long time. His money may be consumed in caring for him. His presumptive heirs may die in an unusual order. Tammy Jennings may, for her own reasons, some day obtain a divorce from her husband.
It would not be sensible for me to permit a premature estate battle to be fought under the guise of a divorce action, and I will not permit it.
There are allegations in the petition to the effect that Tammy Jennings has not properly fulfilled her duties as guardian of the person and property of Lawrence Jennings. The duties of a guardian in a situation such as this are relatively simple and straightforward. They are, however, important duties, and it is mandatory that they be performed in an adequate fashion. If Fanny Jennings believes that Tammy Jennings has failed to perform her duties as guardian properly, she may bring an action to have Tammy Jennings removed as guardian. (The present proceeding is not such a removal action.) The failure of Tammy Jennings to perform adequately as guardian of her *62 husband, if proven, would not justify bringing a divorce action against her.
In Point IV of his brief, counsel for Fanny Jennings poses a hypothetical case in which an imaginary wife hires a killer to murder her husband. The attempt fails, but it does render the husband permanently incompetent. Counsel asks whether the law could fairly deny the husband, acting through a guardian, the right to seek a divorce. If, as a judge, I ever come across counsel's hypothetical wife, I am sure that I will figure out a way to deal with her. I might well rule in favor of a divorce proceeding in a case such as that, and I would certainly prevent the hypothetical wife from getting her husband's money. But our present real case is very different from counsel's hypothetical case. Tammy Jennings is in no way responsible for her husband's sad condition. She is a victim of the accident which has incapacitated him.
As I read the documents filed by the parties in this case, I am aware that there is considerable emotional hostility between Lawrence Jennings' mother and his wife. Fanny Jennings thinks that her son has been terribly wronged by his wife. Given Fanny Jennings' perception of what has occurred in this situation, I can appreciate how deeply offended she must feel and I can understand why she would like to see some sort of public censure placed on her daughter-in-law by the decision in this case.
I do not know whether Tammy Jennings has committed adultery and I have no need to inform myself about that. I know that it must be extremely difficult for a young woman to be deprived of the companionship and sexual fulfillment of marriage. No children have been born to Lawrence and Tammy Jennings, and, in some ways, that probably makes things even harder than they would otherwise be. I would be slow to condemn her for reaching out for comfort and emotional support. Whether or not she has committed adultery, I can understand that she feels slandered by the attempt of her mother-in-law *63 to bring a divorce action against her. I can see why she has felt the need to strike back at Fanny Jennings in some of the papers she has filed in this case.
An enormous emotional burden has been placed upon each of the women in the case by the tragic misfortune which has come upon their son and husband. I would very much like to be able to lighten that burden for each of them, but permitting them to become involved in an acrimonious divorce action would not be the way to do it.
Some of the publicity surrounding this case has suggested that a major issue in this case is whether courts will uphold traditional concepts of marital fidelity. That issue is not really what this case is about. The circumstances of this case are too difficult and too extenuating to make it a good vehicle for discussing, much less adjudicating, the relationship between the law and marriage in modern times.
In some respects, this case turns more on the limitations of judicial power than upon other concepts. There are many real problems, many sad problems, confronting the parties in this case. Most of those problems simply are not susceptible to being resolved by legal decisions rendered by a judge. Courts are increasingly asked to come up with solutions to intractable personal and social problems. Sometimes the best thing a judge can do is to admit his inability to help. I think this is one of those times.
As a person, I can express the hope that Fanny Jennings will find the strength to bear the grief of this situation. I hope that she will find comfort and support in the love of her other children. I hope that Tammy Jennings will be able to find companionship with honor. I hope that both women will find it possible to overcome their present bitterness towards each other. I hope that God in His mercy will soon call Lawrence Jennings from this world to a better place  a place where every tear will be wiped away, where every wrong will be righted, where every sorrow will turn to joy. As a judge, there is no appropriate help *64 which I can give to any of these three very needful people within the context of the proposed matrimonial litigation.
The petition of Fanny Jennings is denied.
On this 9 day of October, 1981, the following Order is entered:
1. The petition of Fanny Jennings to be appointed as guardian ad litem of her son Lawrence Jennings for the purpose of bringing an action for divorce on his behalf is denied.
2. The denial is without prejudice to the bringing of an action for removal of Tammy Jennings as the guardian of the person and property of Lawrence Jennings.
3. The denial is without prejudice to the bringing of an action after the death of Lawrence Jennings to bar Tammy Jennings from securing any property of Lawrence Jennings under the laws of intestate succession.
4. The present proceedings are terminated by this order.
5. No costs and no fees are allowed.